A89A0911. GETZ EXTERMINATORS OF GEORGIA, INC. v. TOWE et al.
(387 SE2d 338)

BIRDSONG, Judge.
In late 1984, William and Charlon Towe entered a contract to purchase a house, and thereafter arranged to finance the purchase through Fairfield Financial Corporation. On the day of the scheduled closing, Fairfield insisted on a "termite letter," and for that purpose the appellant inspected the house and prepared an inspection report. This inspection report warned of visible evidence of previous infestation and damages from wood-decaying fungus, but not from termites. The report also indicated that the appellant had treated the house in 1969 "for prevention or control of subterranean termites," and that the treatment was warranted until May 1985.

Initially, because of this termite letter, Fairfield's attorney felt insecure about allowing the loan to close, but a telephone contact

with the appellant allayed any concern. This attorney contacted Mrs. Towe and only related to her the report's information about the damage and the dormant wood fungus. The Towes never saw the termite letter prior to the closing. About 11 days after the closing, the Towes discovered a swarm of termites in their den. Subsequent inspection by other pest control companies and contractors revealed extensive termite damage throughout the house. (At trial, although there was evidence that repairs could be made for $18,500, there also was evidence that the house was so damaged that it had no value.)

Subsequently, the Towes and Decatur Federal Savings & Loan Association, to whom Fairfield had assigned its interest, sued the appellant for negligent inspection. The jury awarded the Towes and Decatur Federal $98,000 for actual damages, and awarded the Towes $12,012.92 as consequential damages and $150,000 as punitive damages. This appeal followed. *Held*:

1. If any improper insurance evidence was injected in this case, as appellant complains, it was appellant's own fault.

Appellant defendant complains that plaintiff's attorney queried a prospective juror, who was an insurance agent: "Because of your business relationship with *one of the defendant insurance companies*, do you feel that it would impair you to render a verdict just solely on the evidence. . .?" (Emphasis supplied.) Thus it was improperly and inaccurately stated only *that an insurance company was a defendant in the case*. The defendant's attorney objected to "the statement that Interstate [the named insurance company], was a defendant in this case, which is simply incorrect and misleading."

The trial court immediately instructed the jurors that they "should lay aside any impression on your minds from that statement. [The named insurance corporations] are not parties in this case. They are not parties, either as plaintiffs or defendants. That should not have been mentioned to you, because it is inaccurate. They are not parties in the case, and any impression that was created in your mind by the mention of them . . . should be removed." To this curative instruction, defendant Getz' counsel did not object, until after the panel was ruled qualified as to relationships.

Appellant's counsel then stated to the court: " . . . I think at this point in time the jury knows that an insurance company is involved, one of the defendants in the case. I'm not sure how we can correct this. The only thing I know to do is move for a new panel. *The first thing they have heard is two statements that the defendant has liability insurance*, and then a long discussion, and the first ruling from the court is the direction to disregard the . . . [statements] that the defendant was a liability insurance company." (Emphasis supplied.)

This quoted objection by defense counsel misinterprets what occurred. Prior to any jury selection proceedings, the parties and trial

court discussed at length the plaintiff's bad faith claim versus the inadmissibility of insurance evidence and the trial court's desire to avoid a mistrial. Then, *the defendant* brought up the matter of qualifying jurors as to Interstate Fire & Casualty Company (its liability insurer) and agreed to such qualification, while successfully protesting any qualification as to Interstate's parent or sister company. The jurors were then brought in and the trial court inquired as to any relationships with Interstate. One juror avowed that he was an independent insurance agent who could and did sell insurance for that company.

The plaintiff mortgagee's counsel moved to disqualify this juror. It was *the defendant-appellant's counsel who then said defendant did not think this juror should be disqualified.* The trial court asked for "reasons," and in the ensuing discussion the plaintiff mortgagee's attorney asked the juror if, and how long, he had sold policies for Interstate and what kind of policy he sold for Interstate. The juror responded that he sold "property insurance and general liability insurance." Mortgagee's counsel asked, "What kind of property coverage?" and the juror replied: "Commercial buildings. That is all, to my knowledge, right now."

The foregoing colloquy is the only mention of "liability" insurance we find in this transcript up to the time of the appellant's objection. Only by inviting speculation does it suggest that defendant *Getz* had liability insurance. More significantly, however, it was Getz who elicited these remarks by urging and agreeing that jurors be qualified as to relationships with its insurer, Interstate. And most significantly, appellant Getz did not at the time object to this mention of the word "liability."

It is clear upon the face of the record that appellant's later complaint that "[t]he first thing [the jurors] have heard is . . . that the defendant has liability insurance," is simply not correct. Moreover, if that statement were accurate, it was the appellant who, in all, brought the matter out before the jury.

Appellant's complaint of the second of "two statements" put before the jury by plaintiff (by query to the juror about his relationship "with one of the defendant insurance companies") is more accurately based, but does not provide a ground for reversal of the verdict. Appellant complained of this statement at the time it was made, and the trial court quickly instructed the jury to disregard, as "inaccurate," any mention that an insurance company was a defendant. Therefore, the improper statement was clearly and precisely cured.

Finally, but not least, these curative remarks did more than cure any prejudicial idea that appellant had liability insurance: they just as easily implied to the jury the appellant *had no insurance*, since no insurance company was a defendant in the case. In any event, the

mere reference to "defendant insurance companies," could be poisonous only in combination with the earlier vague mention of "liability" insurance, which appellant induced by claiming that the insurance agent juror should not be disqualified and thus laying ground for all of the subsequent questioning of this juror, of which it now complains.

Finally, if there was any real prejudice left hanging that was not appellant's fault, appellant did not move vigorously enough to remove it, for it asked only for a new panel, and did not then ask for a mistrial so as to place the trial court on firm notice that it deemed itself to be mortally offended and deemed its case to be irretrievably poisoned by the injection of this evidence. Appellant thus deprived the trial court of any last chance to fix the perceived damage of which appellant so fiercely now complains.

If there had been an improper injection of insurance evidence in a case, it would not automatically require a reversal. *Reliance Ins. Co. v. Bridges*, 168 Ga. App. 874 (3) (311 SE2d 193). "It is only where the testimony is *so obviously prejudicial in its nature that its adverse effect cannot be eradicated from the minds of the jury* or its consequences avoided by proper cautionary instructions from the court, that a mistrial [reversal] should be granted." (Emphasis supplied.) *Wallace v. Cates*, 120 Ga. App. 228 (170 SE2d 40).

Nothing to the contrary was held in *Collins v. Davis*, 186 Ga. App. 192 (366 SE2d 769). There, we emphasized the strength of the rule against improper injection of insurance evidence, but we did not hold that such evidence requires reversal of the verdict as a matter of law. We reversed the verdict in *Collins* because under the "highly disputed and uncertain nature of the evidence relating to negligence" (id. p. 195), it could not be said the verdict in favor of the defendant Davis was uninfluenced by evidence that the plaintiff had insurance.

The evidence in this case clearly preponderates to only one reasonable conclusion: that the appellant was negligent in its inspection in failing to discover a termite infestation so severe that only twelve days after the appellees moved in their new home, they discovered a swarm of thousands of termites in their den, and thereupon discovered the infestation to be so extensive and of such duration that it had by that time caused such severe structural damage that some evidence showed the house to be "worthless."

The appellant exterminating company's only significant defense to having issued a clean inspection letter appears to revolve around the idea that the official state-regulated "termite letter" form expressly provided that the inspection did not cover "any condition or damage which was not visible at time of inspection but which may be revealed in the course of repair or replacement work." But the "condition" here was not revealed only "in the course of repair or replace-

ment work." It was rather shockingly revealed to the homeowners only days after inspection, by swarming thousands of termites exuding into their den.

A termite inspection is relied upon because the inspector is expected to inspect and discern a little more than may be "visible" to the nonprofessional eye. There was evidence that termites can "swarm suddenly" in the spring, and can "build an inch [of detritus] overnight," but these suggestions do not explain the infestation that manifested itself in force only twelve days after inspection and thereby revealed such extensive damage. There was also evidence that if a particular infestation is in a "hidden spot," it may not be discovered unless you "just happen to probe that particular wall." But the damage and infestation in this house plainly was not limited to a "particular wall." The extensive damage was found "throughout the house."

There was much opinion evidence that the live infestation had been present at least six months or a couple of years, or two or three years, or three or four years, or five to seven years. One expert testified the damage was so obvious that anyone with a reasonable degree of ability as an inspector could have determined the damage, and that anyone trained in the exterminating business should have found *visible* evidence of damage in the basement. This same witness described at length the other areas of the house of visible previous infestation and damage, that is, *visible to any trained person*, and testified that in his 33 years of experience, this house would be "close to first," as bad as any house he had ever seen. So extensive was the damage that one estimate of repair exceeded $180,000, which was nearly $70,000 more than the plaintiffs had paid for the house.

The appellant's apparent defense, that the termite infestation was not "visible" to its inspector, pales beside such evidence. We on the appellate level are not judges of credibility, but we often are called to determine whether a body of evidence is so overwhelming and so substantiated, or is undisputed or so weakly disputed, that it speaks to but one reasonable result.

The preponderation of evidence in this case reasonably speaks only to the negligence of the appellant in inspecting the house, and not seeing what should have been "visible" to any professional—and indeed was quickly "visible" to several others—only a few days later after the insects intruded in force into the interior of the house. Therefore, the probability or even likelihood that any extraneous insurance evidence was so prejudicial that it could not be eradicated and affected the jury's verdict, is very small indeed in this case.

2. Appellant Getz contends evidence of the renewal of warranty after the inspection report was issued, was improper because it could not relate to plaintiff's sole claim, i.e., the claim of negligence. This

complaint is without merit. In the face of the shocking evidence of severe infestation and damage, which revealed itself so soon after the inspection, this warranty renewal could show a continued course of inattentive conduct that might bear upon the issue of appellant's earlier negligence.

In any event, the evidence was at worst irrelevant to the negligence issue, and surely was not such as to require reversal of this verdict, in the face of the overpowering evidence in plaintiff's favor.

3. The award of punitive damages was supported by evidence which, as the jury evidently found, suggested " 'that entire want of care which would raise the presumption of a conscious indifference to consequences' " (*Deavers v. Standridge*, 144 Ga. App. 673, 676 (242 SE2d 331); OCGA § 51-12-5), or that the inspection was performed with such gross negligence as to indicate a wanton disregard to the rights of others. *Faircloth v. Greiner*, 174 Ga. App. 845, 847 (331 SE2d 905).

Certainly the evidence, with all reasonable deductions therefrom, did not demand a finding negating punitive damages; therefore, appellant was correctly denied a directed verdict and judgment n.o.v. on this issue. See generally OCGA § 9-11-50.

4. Appellant Getz contends the trial court erred in denying its motion for new trial, based on the trial court's failure to cure appellees' attorney's statements in closing arguments that the object of punitive damages was to compensate appellees for pain and suffering. OCGA § 51-12-5 allows punitive damages for "wounded feelings," but appellant contends these are not the same as "pain and suffering." The trial court refused a curative instruction at that point, but advised the jury the statements of counsel were not to be taken as law, and that he would give the proper law to the jury. Appellant does not complain that the proper law was never given to the jury but evidently expected the trial court to charge the jury as to the law during closing argument. This is not the proper trial procedure. The jury statements were interrupted, objection made, and the jury was told by the court in effect to disregard such "statements of law." This was the proper response to appellant's objection at the time it was made.

In any case, appellant has not borne its burden to show error which affected the verdict in a harmful fashion. *Taylor v. Colwell Mtg. Corp.*, 187 Ga. App. 397 (370 SE2d 520). Since there is no prevailing indication that the punitive damages were awarded for pain and suffering and inconvenience rather than for deterrence or wounded feelings in this case, and the evidence well supports the punitive damage award on any basis, it cannot be said that the alleged error affected the verdict at all.

5. What we have said of the evidence heretofore shows there was patently no failure of proof of proximate cause, and therefore Getz

was not entitled to a directed verdict or judgment n.o.v. under § 9-11-50. The termite letter was required as an integral element of the loan approval. Both Decatur Federal Savings & Loan's assignor and the Towes relied upon the letter in lending and borrowing the money; upon it Decatur Federal's assignor approved purchase of the house and the Towes purchased it, to their detriment.

6. Appellant complains the cause of action of Decatur Federal, which it acquired from Fairfield Financial, was in fact not assignable because it involved a personal tort. It is clear, however, that the tort sued upon was damage to property (*Hubbard v. Ruff*, 97 Ga. App. 251 (103 SE2d 134)), which was assignable under OCGA § 44-12-24.

The negligence of Getz in issuing this termite letter occurred before the assignment to Decatur Federal; moreover, the existence of the letter clearly induced or allowed Decatur Federal to accept the assignment to its detriment. It therefore cannot be maintained that Decatur Federal was not itself injured by Getz' negligence.

7. Getz contends the trial court erred in consolidating the cases of Decatur Federal and the Towes without Getz' approval. Clearly this enumeration of error is without merit. The consolidation was appropriate and necessary to avoid inconsistent verdicts, pursuant to § 9-11-61. Appellant Getz fails to support its contention that it can avert such proper consolidation merely by objecting to it; and, in any case, Getz' objection to it was made too late, long after the pretrial order was entered.

8. Finally, appellant contends the trial court abused its discretion "in entering three orders requiring Getz to pay attorney fees under OCGA § 9-15-14." However, Getz has shown no authoritative basis for its claim of "abuse of discretion"; therefore, its enumeration cannot be maintained. See *City of Waycross v. Beaty*, 157 Ga. App. 765 (278 SE2d 697). No factual or legal error is shown in the issuance of three orders providing attorney fees. Therefore, we find no basis to overturn them.

*Judgment affirmed. McMurray, P. J., Banke, P. J., Pope and Beasley, JJ., concur. Deen, P. J., Sognier and Benham, JJ., dissent. Carley, C. J., disqualified.*

DEEN, Presiding Judge, dissenting.

In qualifying the jury, the trial court asked the jury panel whether anyone was associated with the Interstate National Corporation or Interstate Fire & Casualty Company. When one panel member indicated that he sold insurance as an independent agent for one of the companies, the appellees' counsel attempted to ask if his "relationship with one of the defendant companies in this case" would bias him, but the appellant's counsel objected. The trial court told the appellees' counsel to repeat the question so that he could consider the

objection, and counsel more specifically asked the panel member whether his "business relationship with one of the defendant insurance companies" would bias him. In response to the appellant's renewed objection that neither insurance company was a party to this action, the appellees' counsel denied making that statement, and on appeal professes that his interjection of insurance was inadvertent. The trial court instructed the jurors that they should disregard the statement, that the insurance companies were not parties in this case, and that any impression created in the jurors' minds by the statement should be dispelled. The appellant moved for a new panel of jurors, but the trial court denied that motion.

"It is proper to qualify the jury relative to the possible interest which the members may have in an insurance carrier having a financial interest in the outcome of the suit." *Weatherbee v. Hutcheson*, 114 Ga. App. 761, 764 (152 SE2d 715) (1966). However, precaution should be taken to avoid specifically informing the jury that a plaintiff or defendant has insurance coverage, as "[t]hat knowledge on the part of the jury can be, and often is, prejudicial and harmful." Id. at 765. By requesting the jury to be qualified relative to any possible interest in Interstate, which it had every right to do, the appellant most certainly did not invite the appellees' improper injection of the appellant's insurance coverage. Although the interjection of insurance into a case does not automatically result in reversible error, see *Reliance Ins. Co. v. Bridges*, 168 Ga. App. 874 (3) (311 SE2d 193) (1983), this court has recently noted that "the general rule against admitting evidence of insurance or unnecessarily referring to it . . . has not relaxed but has strengthened." *Collins v. Davis*, 186 Ga. App. 192, 195 (366 SE2d 769) (1988).

In the instant case, regardless of whether the appellee's interjection of the defendant's insurance was deliberate or not, the fact remains that the jurors were put on notice that the defendant in this case had insurance. After the jury had been so poisoned, the trial court's instruction to disregard that poisoning was an inadequate cure. Accordingly, new trial should be granted, and I must respectfully dissent.

I am authorized to state that Judge Sognier and Judge Benham join in this dissent.

Decided September 6, 1989 —

Rehearing denied October 24, 1989 — 

*Lamar, Archer & Cofrin, Brian J. O'Shea, Robert C. Lamar*, for appellant.

*Robert J. Reed, McCurdy & Candler, Michael C. McGoff*, for appellees.